**Carol A. OLSON, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of the Social Security Administration,[1] Defendant.**

**No. 97 C 925.**

United States District Court, N.D. Illinois, Eastern Division.

Aug. 21, 1998.

1. At the time of the filing of the Complaint herein, John J. Callahan was Acting Commissioner of Social Security. On September 29, 1997, Kenneth S. Apfel became the Commissioner of Social Security, succeeding John J. Callahan. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Kenneth S. Apfel is substituted for John J. Callahan as the Defendant in this civil action. No further action need be taken by reason of the last sentence of Section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

Robert C. Kielian, Kielian & Walther, Chicago, IL, for Plaintiff.

Assistant U.S. Attorney Matthew D. Tanner, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

KEYS, United States Magistrate Judge.

The Plaintiff, Carol A. Olson, seeks judicial review pursuant to the Social Security Act, 42 U.S.C. § 405(g), of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits. Plaintiff moves this Court for Summary Judgment reversing the Commissioner's decision denying her claim for such benefits or, in the alternative, an Order remanding the case to the Commissioner for further proceedings. The Commissioner has filed a Cross–Motion for Summary Judgment in his favor. For the reasons set forth below, the Commissioner's Motion is denied and Plaintiff's Motion is granted. Specifically, this cause is remanded to the Commissioner for an award of benefits to Plaintiff.

### Procedural History

On February 1, 1994, Plaintiff filed an application for Disability Insurance Benefits, alleging that she had been unable to work since May 1, 1992. (R. at 62–64.)[2] She described her disability as being based on chronic fibromyalgia, chronic fatigue syndrome, mitral valve prolapse, and a host of other ailments. (R. at 78.) On June 8, 1994, Plaintiff's application was denied. (R. at 65–67.) On June 20, 1994, Plaintiff filed a request for reconsideration, (R. at 70), which was denied on August 25, 1994. (R. at 71–73.) On October 4, 1994, Plaintiff filed a Request for Hearing, (R. at 74), and, on September 12, 1995, a hearing was held before Administrative Law Judge ("ALJ") Christine Holtz. (R. at 30–61.) On December 19, 1995, the ALJ issued a decision finding that Plaintiff was not disabled. (R. at 14–19.) On December 22, 1995, Plaintiff filed a Request for Review of the ALJ's decision with the Commissioner's Appeals Council. (R. at 10.) On December 13, 1996, the Appeals Council denied Plaintiff's Request for Review of the ALJ's decision, which stands as the final decision of the Commissioner, (R. at 5–6), and is the subject of the Cross–Motions now before this Court.

### Factual Background

#### A. Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff testified that she was then 42 years old, having been born on July 4, 1953. She attained an Associate Arts degree and has worked in the past as a dental assistant and as a secretary/claims analyst for doctors and insurance companies. (R. at 39–42, 82.) She last worked in May, 1990 as a physician's assistant.

Plaintiff testified further that, in May, 1992, she began to feel weak and tired and developed pain in all of her muscles and joints. She also began to develop chronic sinusitis infections and frequent sore throat. She was hospitalized in May, 1992; June, 1992, February, 1993; and June, 1993. (R. at 44–45.) It was thought that Plaintiff had rheumatoid arthritis, but the treatments she was given did not improve her condition. (R. at 47.) Finally, in July, 1993, Plaintiff went to the Mayo Clinic, where she was diagnosed as having chronic fatigue syndrome and fi-

---

**2.** All references are to the certified record prepared by the Commissioner and filed with this Court pursuant to 42 U.S.C. § 405(g).

bromyalgia. (R. at 46–47, 137–138, 172, 176, 417–427.)

In describing the effects of her condition, Plaintiff testified that she becomes tired and fatigued easily upon minimal exertion. For example, the performance of simple household chores, such as putting clothes in the dryer, cleaning the house, or watering her plants, results in her becoming totally fatigued and she must sit down or lie down. Even prolonged standing or walking causes severe weakness and fatigue. Plaintiff testified further that, although she may have some energy in the morning, it is dissipated by noon even if she minimally exerts herself, such as in performing housework, and she must lie down in the afternoon for up to two hours. (R. at 49–50, 100–101.) If she pushes herself one day, she is unable to do anything the next day except lie down due to weakness and fatigue. (R. at 52.) About three times a week, Plaintiff develops dizziness to the point that she feels as if she is about to pass out, which her physician has diagnosed as hypotension. When these attacks occur—which may last for up to two hours—she must sit down. (R. at 53.) Her physician has advised her against driving an automobile because of the effects of the hypotension. (R. at 55.)

Plaintiff testified that, with her chronic fatigue syndrome, she has a chronic sore throat, chronic fevers, chills, and sweats. She also has aches, pain, and swelling of her hands and other joints due to her arthritic condition. (R. at 54.) When this occurs, she has very little use of her hands. (R. at 57.)

Annette Rak is the owner of a gift shop. In a letter dated August 30, 1995, Ms. Rak states that, in September, 1994, Plaintiff asked Ms. Rak to allow her to work in the gift shop for a few hours one day a week so that she could get out of the house. According to Ms. Rak, she scheduled Plaintiff to work from 10:00 a.m. to 2:00 p.m. on Fridays, waiting on customers, answering the telephone, and unpacking and pricing items of stock. Plaintiff was unable to stand for more than 15 or 30 minutes without becoming pale, weak, and tired, and could not lift more than

about five pounds from the boxes before having to sit down. Plaintiff had to sit down in order to serve the customers, and even this would cause fatigue to the point that she would have to go home after about two hours. On some Fridays, Plaintiff would call in to report that she was unable to come in because of her health problems. This experiment lasted for about two months. (R. at 56–57, 434–435.)

### B. Medical Records [3]

Plaintiff's primary care physician is Dr. Bass. Dr. Bass has referred her to Dr. Freeman, an endocrinologist, and Dr. De-Lahera, a cardiologist. She has also been examined and diagnosed by Dr. Mason, at the Mayo Clinic. (R. at 43, 46, 137–138, 417–427.)

The record shows that, since at least 1990, Plaintiff has had persistent complaints of multiple joint pain, sore throat, sinus infections, fevers and chills, nausea, marked weakness, rapid weight loss, chest pains, headaches, dizziness, tiredness, and that she becomes easily fatigued. She has undergone numerous medical laboratory and x-ray workups in an effort to determine the etiology of these complaints. (R. at 369–402.) Plaintiff has been diagnosed as having mitral valve prolapse, (R. at 364–370), and rheumatoid arthritis, with pain and swelling in her fingers and hands. (R. at 184, 397, 441.) It was also thought that Plaintiff might have a malabsorption disorder, (R. at 145, 177), or systemic lupus erythematosis. (R. at 172.) On June 12, 1993, she tested positive for the Epstein–Barr Virus. (R. at 119, 137, 148, 180, 418.)

Because of the diverse opinions and suspicions held by Dr. Bass, Plaintiff's treating physician, Dr. Bass recommended that Plaintiff obtain a more definitive diagnosis from the specialists at the Mayo Clinic regarding her symptoms. (R. at 261.) On July 6, 1993, Plaintiff underwent extensive laboratory tests and examinations by Dr. Mason at the Mayo Clinic. Dr. Mason noted that Plain-

**3.** Plaintiff's medical records consist of more than 300 pages, including medical notes, reports and laboratory analyses. (R. at 109–448.)

tiff—who is five feet, eight inches tall—weighed only 103 pounds, which he considered "remarkable." (R. at 137.)[4] He opined that Plaintiff appeared to be suffering from chronic fatigue syndrome. (R. at 138.) According to Dr. Bass, Dr. Mason also felt that Plaintiff suffered from malacia and, possibly, early-stage systemic lupus. (R. at 176.)

On April 26, 1994, Plaintiff was examined by Dr. Vinod G. Motiani at the request of the Commissioner. Despite his lack of objective findings on physical examination of Plaintiff, based on his review of her medical history and symptoms, Dr. Motiani believed that her complaints of diffuse pain was consistent with a diagnosis of fibromyalgia and that Dr. Mason's diagnosis of chronic fatigue syndrome was plausible. (R. at 208.) In a report dated July 28, 1994, Dr. Bass diagnosed Plaintiff as having chronic fatigue syndrome, with fatigue and low energy levels. (R. at 217.)

## C. The ALJ's Decision

In her December 19, 1995 decision, the ALJ summarized the medical records and the objective findings contained therein. She found that the evidence supported a finding that Plaintiff suffers from mitral valve prolapse, sinusitis, rheumatoid arthritis, hypoglycemia, hypotension, premature menopause, chronic fatigue syndrome, bronchitis, fibromyalgia, and chronic obstructive pulmonary disease, and that such impairments cause significant limitations in Plaintiff's ability to work. (R. at 15–16.) The Court's review of the record reveals that all of the above findings are supported by the record. The ALJ found further, however, that Plaintiff's "statements"[5] concerning her impairments and their impact on her ability to work were not entirely credible, in light of the degree of medical treatment required, discrepancies between her assertions and information contained in the medical reports, reports of treating and examining physicians, her medical history, the findings made on examination, and Plaintiff's assertions concerning her ability to work. (R. at 16–17.) The ALJ noted, erroneously, that Plaintiff was working part-time. She found, further, that Plaintiff's condition was fairly well controlled with hormonal therapy and other medications, which helped to relieve her pain, fatigue and loss of energy to the extent that she could perform sedentary work, not requiring the lifting of more than ten pounds or standing or walking for prolonged periods. The ALJ found, therefore, that Plaintiff retained the capacity to perform her past work as a secretary, claims analyst and office manager, and that, therefore, she was not disabled. (R. at 16–17.)

## STANDARD OF REVIEW

▇▇▇ In reviewing the Commissioner's (here the ALJ's) decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir.1994). Rather, the court must accept findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g)(1988), where substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron,* 19 F.3d at 333 (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). The ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors her ultimate conclusion. *Id.* Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or ALJ), not the courts. *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir.1990). *See also Stuckey v. Sullivan,* 881 F.2d 506, 509 (7th Cir.1989) (the ALJ has the

---

4. On June 11, 1992, Plaintiff weighed 116 pounds and was described as being "thin, anorexic-appearing." (R. at 402.) On June 22, 1993, she weighed 99–1/2 pounds. (R. at 177.) On June 23, 1993, she was described as being "very excessively thin almost malnourished." (R. at 126.) On July 16, 1993, she weighed 103 pounds, (R. at 145), and on April 26, 1994, she weighed 113 pounds. (R. at 207.)

5. In addition to her testimony at the hearing, Plaintiff also submitted a "Fatigue Questionnaire" in which she described her weakness, fatigue and pain, and the effects of her symptoms on her ability to engage in work-related activities. (R. at 100–101.)

authority to assess medical evidence and give greater weight to that which she finds more credible). This Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Secretary of Health and Human Services,* 969 F.2d 534, 538 (7th Cir.1992).

■ This does not mean that the Commissioner (or ALJ) is entitled to unlimited judicial deference, however. In addition to relying on substantial evidence, the ALJ must articulate her analysis at some minimal level and state her reasons for accepting or rejecting "entire lines of evidence," although she need not evaluate in writing every piece of evidence in the record. *See Herron,* 19 F.3d. at 333; *see also Young v. Secretary of Health and Human Services,* 957 F.2d 386, 393 (7th Cir.1992) (ALJ must articulate her reason for rejecting evidence "within reasonable limits" in order for meaningful appellate review); *Guercio v. Shalala,* No. 93 C 323, 1994 WL 66102, *9 (N.D.Ill.1994) (ALJ need not spell out every step in her reasoning, provided she has given sufficient direction that the full course of her decision may be discerned), (citing *Brown v. Bowen,* 847 F.2d 342, 346 (7th Cir.1988)).

The Social Security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (1994). The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520 (1994); *see also Young,* 957 F.2d 386, 389. A finding of disability requires an affirmative answer at either step 3 or step 5. A negative answer at any step (other than step 3) precludes a

finding of disability. *Id.* The claimant bears the burden of proof at steps 1–4, after which the burden shifts to the Commissioner at step 5. *Id.*

In the instant case, the ALJ found that the Plaintiff satisfied her burden of proof as to steps 1 and 2.[6] The ALJ also found, at step 3, that Plaintiff failed to demonstrate any impairment that met or equalled in severity any of the impairments listed in the Commissioner's listing of impairments which are presumptively disabling.

Moving to step 4, the ALJ found that Plaintiff was capable of performing work which she had performed in the past and that, therefore, she was not disabled. Having determined that Plaintiff could perform her past relevant work, it was not necessary that the ALJ advance to step 5 to determine whether there was other work that she could perform.

### *Discussion*

■ In her evaluation of the evidence, the ALJ found that Plaintiff has diagnoses of mitral valve prolapse, sinusitis, rheumatoid arthritis, hypoglycemia, chronic fatigue syndrome, bronchitis, fibromyalgia, and chronic obstructive pulmonary disease. She found further that Plaintiff has "episodes" of hypotension, associated with lightheadedness and dizziness, and menopausal symptoms, for which she takes hormonal replacement therapy. The ALJ found further that, while these impairments were "severe", within the meaning of the regulations, they neither met nor equalled any of the impairments set forth in 20 C.F.R., pt. 404, subpt. P, app. 1 (the "Listings"), the severity of which the Listings mandate a finding of disability. In so finding, the ALJ noted only that no treating or examining physician had mentioned any findings which would support such a conclusion. Considering the number of severe impairments which the ALJ found were supported by the medical records, it would have been helpful to this Court's review had she explicated her reasoning in concluding that a combination of those impairments did not

---

**6.** The ALJ's finding that Plaintiff was working part-time was erroneous. Plaintiff testified that, other than the four-hours-a day, one-day-a-week attempt to work with Ms. Rak for two months in late 1994, (R. at 434–435), she had not worked since May 1990. (R. at 42.)

meet or equal the severity of any of the listed impairments. Perhaps, the testimony of a medical advisor, as authorized by 20 C.F.R. § 404.1527(f)(2), would have been helpful to the ALJ in making this decision. As the record now stands, however, the Court is unable to discern the ALJ's reasoning in this regard. Accordingly, the Court finds that the ALJ's conclusion that a combination of Plaintiff's impairments does not meet or equal in severity any of the listed impairments is not supported by substantial evidence.

Notwithstanding the myriad impairments demonstrated by the record, as set forth above, the record shows that Plaintiff's most persistent symptoms have been pain and swelling in her hands and fingers, weakness and fatigue after minimal exertion, and light-headedness and dizziness due to hypotension. Because of these symptoms, Plaintiff testified, she often has difficulties in using her hands, she is unable to sustain any work-related activities—regardless of the exertion required—for prolonged periods, and she must lie down for up to two hours each day due to fatigue and/or dizziness. This testimony stands unrefuted. Moreover, neither Plaintiff's treating physicians nor any of her examining physicians have questioned the existence of Plaintiff's symptoms. The ALJ acknowledged that Plaintiff has diagnoses and medically documented complaints that could account for these symptoms—rheumatoid arthritis, fibromyalgia, hypotension, and chronic fatigue syndrome—but discredited her testimony and other statements regarding the frequency, duration, and intensity of these symptoms and the functional limitations caused thereby. After briefly summarizing Plaintiff's medical records with respect to each of her complaints—including the positive and negative objective findings—the ALJ disposed of her complaints in an apparently boiler-plate one-sentence finding:

> Ms. Olson's statements concerning her impairments and their impact on her ability to work are not entirely credible in light of the degree of medical treatment required, discrepancies between the claimant's assertions and information contained in the documentary reports, the reports of the treating and examining practitioners, the medical history, the findings made on examination, and the claimant's assertions concerning her ability to work. (R. at 16–17.)

The ALJ Then went on to find that Plaintiff—despite her multiple severe impairments—still retained the functional capacity to perform sedentary work not requiring prolonged standing or walking or the lifting of more than ten pounds. In support of her decision in this regard, the ALJ noted that Plaintiff's condition is fairly well controlled with medication, and that she was undergoing hormonal therapy which helped to relieve her pain, fatigue, and loss of energy. Finally, the ALJ noted, erroneously, that Plaintiff was currently working, albeit only part-time. (R. at 17.) This was the extent of the ALJ's analysis of this most complex case.

Having carefully reviewed Plaintiff's entire medical record, the Court is unable to conclude that the ALJ's decision to discredit Plaintiff's testimony and her statements contained in the "fatigue questionnaire" regarding her impairments and their impact on her ability to work, is supported by substantial evidence. Indeed, the Court is unable to discern the ALJ's reasons for not fully crediting Plaintiff's testimony and other statements in this regard in view of the medical record as a whole. For example, one of the reasons the ALJ alluded to was the degree of medical treatment required. However, Plaintiff's voluminous medical record reveals that she has been hospitalized on numerous occasions and that her complaints to her treating and examining physicians have been both persistent and consistent. Her physicians—none of whom has voiced any doubts as to the legitimacy of her complaints—have prescribed numerous medications, including steroids, in an attempt to alleviate her pain and other symptoms. The ALJ asserted that there are discrepancies between Plaintiff's assertions, her medical history, information contained in the documentary reports of the treating and examining physicians and the findings made on examination, with regard to her impairments and their impact on her ability to work. However, those alleged discrepancies were not set forth or even discussed in the decision. Moreover, it is noted

that no treating or examining physician has opined or even suggested that Plaintiff is able to work.[7]

With regard to Plaintiff's complaints of joint pain, the record shows that she has tested positive for rheumatoid arthritis,[8] (R. at 184), and has been described as having diffuse joint pains consistent with a diagnosis of fibromyalgia.[9] (R. at 208.) The ALJ noted the April 26, 1994 examination of Plaintiff by Dr. Motiani, during which he noted her complaints of joint pain in her hands and wrists, and noted further that this was consistent with Plaintiff's June 1992 hospital records, which also noted her complaints of hand pain. The ALJ noted further, however, that Dr. Motiani found no neurological deficits on examination and that he reported that Plaintiff had good function of both hands on that date. (R. at 16.)

Plaintiff testified that the joints of her hands ache all the time, which pain is exacerbated when she attempts to use them, such as in opening a jar. The pain and swelling in the other joints of her body comes and goes. (R. at 57–58, 441.) The Court is of the opinion that there is nothing inconsistent between Plaintiff's testimony concerning the extent of the pain in the joints of her hands and the functional limitations caused thereby, and Dr. Motiani's observation that she was able to use her hands normally during his one examination.

Plaintiff has a clearly diagnosed history of hypotension.[10] (R. at 429, 442.) Plaintiff has complained of becoming lightheaded and dizzy. Although she has not passed out, she has come close to doing so. (R. at 442.) Plaintiff's treating physician states that her symptoms of lightheadedness result from her low blood pressure (hypotension), which symptoms would interfere with her ability to work. (R. at 429.) Plaintiff testified that she becomes dizzy to the point that she feels that she is about to pass out about three times per week and that, at such times, she must sit down for up to two hours. The ALJ noted that Plaintiff has "hypotensive episodes associated with lightheadedness and dizziness" and cited her abnormally low blood pressure readings. She did not discredit Plaintiff's testimony regarding the frequency and duration of these episodes, and did not explain how Plaintiff would be able to work a regular job in such circumstances.

In her decision, the ALJ noted that Plaintiff has a diagnosis of chronic fatigue syndrome, associated with headaches, nausea, abdominal cramps and shakiness, and that she experiences fatigue and loss of energy when she does not take her prescribed estro-

7. The only physicians to opine that Plaintiff is able to work were non-examining physicians Dr. Kim and Dr. Villaflor, both of whom based their opinions only on a review of the file at the request of the Commissioner. Interestingly, they were of the opinion that Plaintiff—despite her chronic fatigue syndrome and other documented ailments—could frequently lift and carry 25 pounds and occasionally lift and carry up to 50 pounds and stand and/or walk up to six hours in an eight-hour work day. (R. at 209–216.) Obviously, the ALJ rejected those unexplained assessments in favor of her own assessment that Plaintiff could perform work only at the sedentary level, although her reasoning in this regard was not explicated.

8. Rheumatoid arthritis is, "a chronic systemic disease primarily of the joints, usually polyarticular, marked by inflammatory changes in the synovial membranes and articular structures and by atrophy and rarefaction of the bones... The cause is unknown, but autoimmune mechanisms and virus infection have been postulated." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 122–123

(26th ed.1985). Pain and swelling in the joints involved (hands, feet, wrists, elbows, and ankles) is typical. "Stiffness lasting more than 30 minutes on arising in the morning or after prolonged inactivity is common and early afternoon fatigue and malaise also occur." THE MERCK MANUAL 1177 (14th ed.1982).

9. Fibromyalgia—also known as fibrositis—is "a common, but elusive and mysterious disease, much like chronic fatigue syndrome, with which it shares a number of features... Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia." Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir.1996) (citations omitted).

10. Hypotension is an abnormally low blood pressure. A fall in blood pressure associated with dizziness, syncope (a temporary suspension of consciousness, faint) and blurred vision occurring upon standing or when standing motionless in a fixed position. DORLAND'S 643, 1287.

gen. (R. at 15–16.) [11] In support of his Cross–Motion for Summary Judgment, the Commissioner asserts that Plaintiff does not have a *definitive* diagnosis of chronic fatigue syndrome. In this regard, the Commissioner notes that Dr. Mason opined only that Plaintiff met "the current working definition of chronic fatigue syndrome." Defendant's memorandum in Support of the Commissioner's Decision ("Def.'s Mem.") at 12.

While the Commissioner is correct that the diagnosis of chronic fatigue syndrome is less than definitive, both Dr. Mason, at the Mayo Clinic, and Dr. Bass, Plaintiff's primary treating physician, are satisfied that Plaintiff's symptoms are consistent with that diagnosis. Thus, Dr. Mason—while noting that some of her objective findings would tend to go against that diagnosis—noted that Plaintiff has tested positive for the Epstein–Barr Virus,[12] (R. at 119, 137, 148, 180, 418), and that her symptoms are consistent with chronic fatigue syndrome or some other autoimmune system disease. In this regard, it has been speculated, at one time or another, that Plaintiff might have mononucleosis, systemic lupus erythematosis,[13] fibromyalgia, rheumatoid arthritis or the Human Immunodeficiency Virus (HIV), all of which involve the autoimmune system. The record shows that Plaintiff has undergone numerous laboratory tests in an attempt to confirm or rule out the various autoimmune system diseases.

Because chronic fatigue syndrome is diagnosed partially through a process of elimination, as has been done here, the failure of Plaintiff's physician to state a *conclusive* diagnosis does not constitute substantial evidence to support a conclusion that she does not suffer from chronic fatigue syndrome. *See Rose v. Shalala,* 34 F.3d at 18, *citing Sisco v. U.S. Dept. of Health and Human Services,* 10 F.3d 739, 744–745 (10th Cir. 1993). Indeed, the Commissioner's own policy statement recognizes the inherent difficulties faced by adjudicators in assessing chronic fatigue syndrome allegations. While the binding effect of the Commissioner's written policy statements may be questionable, his policy statement concerning the way in which disability adjudicators are to evaluate allegations of chronic fatigue syndrome is instructive.

Chronic Fatigue Syndrome (CFS), previously known as Chronic Epstein–Barr Virus Syndrome, and also currently called Chronic Fatigue and Immune Dysfunction Syndrome, is a systemic disorder consisting of a complex of variable signs and symptoms which may vary in duration and severity. The etiology and pathology of the disorder have not been established. Although there are no generally accepted criteria for the diagnosis of cases of CFS, an operational concept is used by the medical community. There is no specific treatment, and manifestations of the syndrome are treated symptomatically.

CFS is characterized by the presence of persistent unexplained fatigue and by the chronicity of other symptoms. The most prevalent symptoms include episodes of low-grade fever, myalgias, headache, painful lymph nodes, and problems with memory and concentration. These symptoms

---

11. On February 22, 1994, Dr. Bass noted that Plaintiff was then off estrogen and complained of being totally fatigued, with no pep or energy. However, as long as she was taking estrogen at a reduced dosage level, she had more energy and pep. (R. at 245.) The ALJ apparently concluded, from this entry, that Plaintiff's fatigue is well-controlled so long as she takes estrogen. Such a conclusion is clearly unwarranted, considering the many other medications—including steroids—that Plaintiff's physicians have tried in an attempt to alleviate her symptoms and the side effects she has experienced from the estrogen. (R. at 174–176, 256–257.)

12. Epstein–Barr Virus is a herpes-like virus that causes infectious mononucleosis, which is characterized by malaise, fatigue, headache and chills, followed by high fever and a sore throat. The Merck Manual, 203. Chronic fatigue syndrome was previously known as Chronic Epstein–Barr Virus Syndrome and the two terms are sometimes referred to interchangeably. *Rose v. Shalala,* 34 F.3d 13, 16–17 (1st Cir.1994), quoting from the Commissioner's Program Operations Manual System (POMS)(1993), Section DI24575.005, and *Cohen v. Secretary of DHHS,* 964 F.2d 524, 529 (6th Cir.1992).

13. An inflammatory autoimmune disorder that may affect multiple organ systems... The systemic features include fever, anorexia, malaise and weight loss. Marcus A. Krupp And Milton J. Chatton, Current Medical Diagnosis & Treatment, 1982, 491–492 (1982).

fluctuate in frequency and severity and may be seen to continue over a period of many months. *Physical examination may be within normal limits.* Individual cases must be adjudicated on the basis of the totality of evidence, including the clinical course from the onset of the illness, symptoms, signs, and laboratory findings. Consideration should be given to onset, duration, severity and residual functional capacity following the sequential evaluation process.

*Rose,* at 16–17, *quoting* POMS § DI 24575.005 (1993)(emphasis added). (The Commissioner's current policy statement on the evaluation of chronic fatigue syndrome has not changed since 1993, but is found at POMS § DI 24515.075.)

In the instant case, the ALJ found that Plaintiff has chronic fatigue syndrome. Based on the positive Epstein–Barr Virus test, the examinations and opinions of Drs. Bass, Mason and Motiani, and the Court's review of the entire record, it is clear that the ALJ's finding in this regard is supported by substantial evidence. The question remains, however, as to whether the ALJ properly discredited Plaintiff's testimony and other statements regarding the severity of her symptoms and the negative impact of those symptoms on her ability to engage in work-related activities. While it is within the province of the ALJ, not the Court, to make credibility findings regarding testimony and other evidence, such findings must be articulated to some degree in order to afford meaningful judicial review. *Herron,* 19 F.3d at 333–334. Here, while finding Plaintiff's testimony and other statements "not entirely credible", (R. at 18), the ALJ failed to perform any analysis or to cite to any specific testimony or other statements of Plaintiff which she found incredible or to set forth the inconsistencies in the record which led her to discredit such testimony or statements. Here, it is again noted that the ALJ erroneously found that Plaintiff was working on a part-time basis. Whether that mistake of fact influenced the ALJ's decision regarding Plaintiff's overall credibility is not known.

In the absence of any articulation by the ALJ as to her reasoning in discrediting Plaintiff's testimony and other statements regarding the severity of her symptoms and their impact on her ability to engage in work-related activities, the Court must find that her decision in this regard is not supported by substantial evidence.

### Summary

The record shows that Plaintiff has persistently complained of chest pains, headaches, nausea, multiple joint pain, sore throat, sinus infections, fevers, chills, rapid weight loss, marked weakness, dizziness, tiredness, and that she becomes easily fatigued upon minimal exertion. Prior to July 1993, Plaintiff's treating physician suspected that she suffered from some type of autoimmune system disease, since she had tested positive for both rheumatoid arthritis and the Epstein–Barr Virus. Because of those suspicions, Plaintiff was referred to the specialists at the Mayo Clinic for a more definitive diagnosis. After carefully reviewing Plaintiff's medical records—including the reports on the positive rheumatoid arthritis and Epstein–Barr Virus tests—further laboratory tests, her history of complaints, and after performing his own examination, Dr. Mason agreed that Plaintiff's symptoms and test results were consistent with the existence of an autoimmune system virus disorder, specifically, chronic fatigue syndrome. Dr. Mason recommended certain treatments for Plaintiff's chronic fatigue syndrome, which treatments were implemented by Dr. Bass, with mixed results. Dr. Bass—apparently after further consultation with Dr. Mason—opined that Plaintiff also appeared to suffer from early systemic lupus erythematosis, another autoimmune system disease. Dr. Motiani, the Commissioner's consultative examiner, opined that Plaintiff's symptoms were consistent with fibromyalgia—yet another autoimmune system disease—and that the chronic fatigue syndrome diagnosis made by Drs. Mason and Bass was also plausible.

As set forth above, Plaintiff's descriptions of her symptoms—in her testimony and in the fatigue questionnaire—are consistent with the symptoms of most of the autoimmune system diseases which she has been suspected of having contracted. Further,

none of the doctors who have examined her have indicated a belief or even suspicion that her symptoms and their effects on her ability to perform work-related activities are exaggerated. Simply put, there is no contradictory evidence in the record, and this Court can find no basis upon which the ALJ could have discredited the testimony and statements of Plaintiff regarding her symptoms and their impact upon her ability to engage in work-related activities, or the statement of Ms. Rak regarding Plaintiff's inability to perform work at the lightest exertional level even for four hours per week. Inexplicably, the ALJ failed to mention the letter from Ms. Rak in which Ms. Rak detailed the difficulties Plaintiff had when she attempted to work in her store. Such evidence should have been considered, although it was within the province of the ALJ to determine the weight to be given such evidence in light of the other evidence of record.[14]

### Conclusion

For all of the reasons set forth above, the Court finds that the Commissioner's finding that Plaintiff, despite her many severe impairments, is able to perform work which she has performed in the past and that, therefore, she is not disabled, is not supported by substantial evidence. Moreover, with respect to the relevant time period covered by this Court's review herein—May 1, 1992 through December 19, 1995, the date of the ALJ's decision—all of Plaintiff's medical records are included in the record. Based on its careful review of the entire record, the Court finds that the evidence in support of a finding that Plaintiff is disabled is more than substantial. It is overwhelming. Moreover, it is not likely that any rational trier of fact would conclude on remand, based on this record and proper analysis of the record, that Plaintiff is not disabled.

Pursuant to 42 U.S.C. § 405(g), the Court is empowered to enter a judgment affirming, modifying or reversing outright the decision of the Commissioner, with or without remanding the cause for further proceedings before the ALJ. The Court is mindful of the deference to which decisions of the Commissioner are entitled when such decisions are supported by substantial evidence. Such deferential policy also favors the remand to the Commissioner, for further remand to the ALJ for a new hearing and decision, of those cases wherein the court determines that the decision of the ALJ is not supported by substantial evidence but wherein further proceedings and proper analysis of the evidence could arguably lead to the same decision. However, where, as here, it is clear from the record that Plaintiff has met her burden of demonstrating her inability to engage in any employment on a sustained basis, and that the Commissioner will be unable to refute said evidence on remand, such deference is not warranted and a remand to the ALJ for a new hearing would only further delay Plaintiff's receipt of deserved benefits. No useful purpose would be served thereby. In this regard, it is noted that Plaintiff filed the application herein on February 1, 1994, more than four and one-half years ago. Accordingly, this cause is remanded to the Commissioner for an award of benefits.

### Order

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment be, and the same hereby is, denied.

14. Apparently recognizing the ALJ's failure in this regard, the Commissioner, *citing* 20 C.F.R. § 404.1567(b)(1996), noted that some of the duties which Plaintiff was asked to perform by Ms. Rak are generally recognized as being within the light exertional category rather than sedentary, and that, therefore, her inability to perform that work is no indication that she could not have performed her prior sedentary work, as found by the ALJ. Def.'s Mem. at 12, n. 3. In this regard, the Court notes that, notwithstanding the Commissioner's definition of such work as normally performed in the economy, as set forth in 20 C.F.R. § 404.1567(b), Ms. Rak stated that Plaintiff could not lift more than five pounds and that she had to sit down after standing for fifteen to thirty minutes because of fatigue. Her inability to perform this work, then, would militate against a finding that she could perform her prior work. Moreover, the ALJ having not mentioned the letter from Ms. Rak in her decision, the Court will not assume that she considered it, and the Commissioner's attempt to justify the ALJ's decision on additional grounds not advanced by the ALJ, is rejected. *See O'Connor v. Sullivan*, 938 F.2d 70, 73 (7th Cir.1991).

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment be, and the same hereby is, granted.