Marikay **DORNACK**, Plaintiff,

v.

**Kenneth C. APFEL, Commissioner of the Social Security Administration, Defendant.**

**Civ. No. 97–2897 (JMR/RLE).**

United States District Court, D. Minnesota.

Feb. 16, 1999.

Fay E. Fishman, Minneapolis, MN, for plaintiff.

Roylene A. Champeaux, Asst. U.S. Atty., Minneapolis, MN, for defendant.

## ORDER

ROSENBAUM, District Judge.

Based upon the Report and Recommendation of United States Magistrate Judge Raymond L. Erickson, and after an independent review of the files, records and proceedings in the above-titled matter, it is—

ORDERED:

1. That the Plaintiff's Motion for Summary Judgment [Docket No. 5] is denied.

2. That the Defendant's Motion for Summary Judgment [Docket No. 10] is denied.

3. That the matter is remanded to the Commissioner for further proceedings in accordance with the views expressed in this Report.

4. That, pursuant to the holding in *Shalala v. Schaefer,* 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993), Judgment is entered accordingly.

## REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social Security Act, *Title 42 U.S.C. § 405(g),* seeking a judicial review of the Commissioner's final decision which denied her application for Disability Insurance Benefits ("DIB"). The matter is presently before the Court upon the parties' Cross–Motions for Summary Judgment. For these purposes, the Plaintiff has appeared by Fay E. Fishman, Esq., and the Defendant has appeared by Roylene A. Champeaux, Assistant United States Attorney.

For reasons which follow, we recommend that the Defendant's Motion for Summary Judgment be denied, that the Plaintiff's Motion be denied, and that the matter be remanded to the Commissioner for further proceedings consistent with this Report.

### II. *Procedural History*

The Plaintiff protectively filed an application for DIB on March 3, 1995, alleging that she became disabled on June 3, 1994, as a result of a Chronic Fatigue Syndrome ("CFS").[1] The Plaintiff met the insured status requirements for DIB through December 31, 1999. Her claim was denied upon initial review and, once again, upon reconsideration.

On July 27, 1995, the Plaintiff requested a Hearing before an Administrative Law Judge ("ALJ") and, on January 2, 1997, a Hearing was conducted, at which the Plaintiff appeared personally, and by legal counsel. Thereafter, on February 3, 1997, the ALJ issued a decision which denied her claim for benefits. The Plaintiff requested administrative review before the Appeals Council which, on July 5, 1997, declined to review the matter further. Thus, the ALJ's determination became the final decision of the Commissioner. *Johnson v. Chater,* 108 F.3d 942, 943–44 (8th Cir.1997); *Browning v. Sullivan,* 958 F.2d 817, 821 (8th Cir.1992); *20 C.F.R. § 1481.* This action was commenced on August 8, 1997.

### III. *Administrative Record*

A. *Factual Background.* The Plaintiff has past work experience as an early childhood teacher. [T. 294]. At the time of the Hearing, she was forty years old, possessed a high school degree, a college degree, and a Masters degree in early childhood special education. [T. 48, 294] As related by the Plaintiff, she suffers from CFS.

The Plaintiff alleges that she has been disabled by CFS since June 3, 1994. [T.

---

1. Chronic Fatigue Syndrome involves a persistent debilitating fatigue of recent onset, with a reduction of physical activity to less than half of usual, that is accompanied by some combination of muscle weakness, sore throat, mild fever, tender lymph nodes, headaches, and depression, and with the symptoms not being attributable to any other known causes. *Dorland's Illustrated Medical Dictionary,* p. 1627 (28th Ed.1994)

60]. The medical record establishes that the Plaintiff first reported nausea, vertigo, and headaches, on March 5, 1991, when she presented herself to Dr. J. Bieraugel. [T. 168]. Dr. Bieraugel prescribed Antivert,[2] and suggested a neurological consultation if her symptoms did not improve. *Id.* She returned to Dr. Bieraugel for a physical examination the following week. [T. 166]. She again reported nausea and vertigo, despite her use of Antivert. *Id.* She also noted visual disturbances, and an increase in her symptoms if she attempted to read or move about. *Id.* Dr. Bieraugel diagnosed her with vertigo, ordered an magnetic resonance imaging scan ("MRI"), and referred her for a neurological examination. *Id.*

The neurological examination, and the MRI scan, were normal. [T. 164, 166]. On March 19, 1991, the Plaintiff reported, after initially disclaiming any ringing in her ears, that she had developed such ringing. [T. 164].

On April 8, 1991, the Plaintiff underwent a neurological examination by Dr. David Webster. [T. 162–63]. The Plaintiff reported headaches and blurred vision, but she denied vertigo or difficulty with balance. [T. 162]. During her examination, the Plaintiff described "icepick," right-sided headaches, pressure in her head and eyes, fuzzy vision, ringing in her ears, nausea, and night sweats. *Id.* She stated that "Dr. Bieraugel *** kept asking me if I had ringing in my ears, and finally I did get the ringing that he was talking about." [T. 1062]. She reported that her symptoms improved after taking a 10-day vacation from work. [T. 162]. Dr. Webster noted that the Plaintiff's symptoms were "vaguely described," and he opined that she would not "turn out to have any serious organic neurological disease." [T. 163]. Dr. Webster also noted that the Plaintiff's husband described her as "a hy-

pochondriac." *Id.* He concluded that the Plaintiff suffered from no neurologically based disorder or disease. [T. 163]. The Plaintiff again met with Dr. Webster on June 3, 1991, when she again complained of fatigue. [T. 159]. She also expressed frustration with the doctor's inability to diagnose an organic source for her symptoms. See, *id.*

Dr. Webster referred the Plaintiff to Dr. Corey for an evaluation of her blood test results. [T. 157]. The Plaintiff reported that she had been "under a tremendous amount of stress recently." [T. 157]. She underwent B12 injections, but with no effect. [T. 156]. On July 18, 1991, Dr. Corey noted that all of the laboratory tests had been unremarkable, except for an elevated mean cell volume, and mild abnormalities of the blood, while her chest x-ray was normal. [T. 153]. Dr. Corey diagnosed the Plaintiff with macrocytosis,[3] but he offered no treatment for it. *Id.* The Plaintiff's B12 therapy was discontinued as Dr. Corey noted no improvement arising from its application.

In December of 1991, after the Plaintiff's insurance coverage changed, she was evaluated on two occasions by Dr. Allan Kind. [T. 218–20]. Dr. Kind noted that the Plaintiff might have CFS. [T. 218]. She reported that the stress of fatigue made working as a teacher for handicapped children difficult. [T. 218]. She reported that her symptoms had not changed, but that she was working full-time and enjoyed working. [T. 216]. She also reported that she did not "have much achiness except some in the back and her neck," but that she became exhausted upon exertion. [T. 219]. Her husband stated that she visited her parents in Rochester, Minnesota, at least every two weeks. [T. 219]. Dr. Kind noted that CFS was "a reasonable diagnosis" for the Plaintiff, and that "it seems quite clear that she is unable to continue

---

**2.** Antivert is a trademark for a preparation of meclizine hydrochloride, which is an antihistamine that is used as an antiemetic in the management of nausea, vomiting, and dizziness, which is associated with motion sick-

ness. *Dorland's Illustrated Medical Reference,* p. 997 (28th Ed.1994).

**3.** Macrocytosis is a condition in which the erythrocytes (i.e., the red blood cells) are larger than normal.

her full-time work." [T. 207]. He recommended reduced activity and rest, in order to see if her symptoms improved, which would followed by exercise. [T. 220].

She was not again seen by Dr. Kind until March of 1994. [T. 208]. Dr. Kind reported that it was "difficult to quantify the proportion of fatigue" that the Plaintiff experienced, but that she could not continue teaching disabled five-year-old children on a full-time basis. [T. 208]. The Plaintiff reported that she slept well if she took amitriptyline,[4] but did not take it regularly. [T. 208]. She reported that over the previous Summer, when she not working, she felt better and was able to manage her condition. [T. 207]. During this visit, the Plaintiff estimated that she was functioning at 30% to 40% of her normal capacity. *Id.*

On June 15, 1994, Dr. Kind recommended that the Plaintiff not work for one year, in order to see if her condition improved. [T. 149]. When, on September 19, 1994, the Plaintiff reported that she did not feel much better since stopping work, Dr. Kind recommended that she not return to work in the Fall. [T. 147].

In February of 1995, she reported that she continued to have fatigue, ringing in her ears, blurred vision, and nausea. [T. 190]. She also reported that she had done "quite well" on vacation in the Cayman Islands. [T. 190, 191]. Dr. Kind noted that it was difficult to predict whether the Plaintiff would be able to return to work in the Fall. [T. 190]. He refilled her prescription for amitriptyline in order to aid her in sleeping.

On March 4, 1995, Dr. Charles Gornick, who is a State agency physician, reviewed the Plaintiff's records and concluded that she could lift up to 20 pounds occasionally, and 10 pounds frequently, could stand and/or walk six hours per day, and could sit six hours per day. [T. 138]. Dr. Gornick noted that the Plaintiff's activities were "moderately restricted" by a chronic fatigue syndrome, and that her condition was not significantly different whether she was working or not. [T. 138]. He stated that the Plaintiff's subjective symptoms had been considered and, accordingly, he restricted her to light work. [T. 142].

On March 15, 1995, Dr. Kind was questioned by a disability examiner regarding his opinion of the Plaintiff's medical condition. [T. 151]. Dr. Kind responded:

> The patient has been seen within the last week or two. She came in with her husband and reported that she just doesn't have the stamina to do much of anything around the house. She is unable to handle grocery shopping as she is just too tired. She had been diagnosed with having chronic fatigue syndrome and appropriate criterion. Currently, she complains of achiness, irritability, and fatigue. She has no positive objective findings. She appears to be a straight shooter and there is no indication to contradict what she reports. She does not appear to be able to maintain a full time job, even at sedentary work, because of her fatigue.

*Id.*

On August 29, 1995, the Plaintiff returned to Dr. Kind. [T. 184]. She recounted continued fatigue, which was aggravated by stress and exertion. *Id.* She also stated that she was experiencing body aches and pains, sleep problems, impaired concentration and memory, and dizziness. *Id.* It was Dr. Kind's opinion that the Plaintiff continued to suffer from CFS.

On November 21, 1995, Dr. Kind reported that the Plaintiff was "very significantly restricted," and could perform only small amounts of house work. [T. 181]. On February 5, 1996, the Plaintiff asked Dr. Kind if she would be able to return to work. [T. 179]. Dr. Kind stated that, based upon the Plaintiff's description of

---

**4.** Amitriptyline is a tricyclic antidepressant of the dibenzo-cycloheptadiene group, which also has sedative effects. The medication is employed in the treatment of enuresis, chronic pain, peptic ulcer, and bulimia. *Dorland's Illustrated Medical Dictionary*, p. 59 (28th Ed. 1994)

her symptoms, he did not think she would be able to work. [T. 179]. He wrote, "I can't imagine that she could survive at anything resembling full-time work." *Id.* In March of 1996, the Plaintiff participated in a chronic fatigue study, but she did not tolerate the medication that she was given, and she had to drop out of the study. [T. 177–78].

In May of 1996, the ALJ requested that the Plaintiff obtain a medical opinion as to how her condition met the definition of CFS that was identified in a magazine article. [T. 243–44]. Dr. Kind reported that the Plaintiff had debilitating fatigue that was not reduced by bed rest, and reduced activity by more than 50 percent, [T. 250]. He also stated that testing had eliminated diseases that could cause similar symptoms, and that the Plaintiff had eight of eleven of the symptoms of CFS. [T. 250]. Dr. Kind concluded that the Plaintiff could not perform even sedentary work on a full-time basis. [T. 249]. As expressed by Dr. Kind:

> Symptoms began abruptly in Feb. of 1991. She was evaluated at Mayo Clinic and here. Main problems (symptoms) are: dizziness, nausea, fatigue, headaches, achiness, lightheadedness, poor concentration, etc. No significant laboratory or physical findings are noted. She does *not* have primary depression.

[T. 251] (emphasis in original).

At the request of the Social Security Administration, on October 30, 1996, the Plaintiff submitted to a consultative psychological examination by Dr. Roger Sandvick. [T. 252–60]. She reported that she experienced "very annoying" fatigue—especially in the mornings—frequent headaches, and problems in concentrating. [T. 253]. She also reported that she took two annual Winter vacations to Las Vegas, in order to visit her parents, and other Winter vacations in order to relax in a warmer climate. [T. 254].

Dr. Sandvick performed a Weschler Adult Intelligence Scale–Revised test, and reported that the Plaintiff had adequate concentration during testing. [T. 256]. The Minnesota Multiphasic Personality Inventory ("MMPI–II") revealed that the Plaintiff "may tend to control others by complaining of physical symptoms," and that her "physical complaints are likely to be used to gain attention to her perceived illness." [T. 256]. Dr. Sandvick expressed the opinion that the Plaintiff had a fair ability to deal with work stresses, and to behave in an emotionally stable manner, and had a good to an unlimited ability to perform all other work-related mental activities. [T. 258–60]. Based upon the results of his examination, Dr. Sandvick concluded that the Plaintiff was suffering from dysthymia,[5] and a dependent personality.[T. 257].

Between June and October of 1996, the Plaintiff returned to Dr. Kind on three occasions. [T. 287, 288, 289]. In each case, she complained of her continued experience of fatigue, headaches, nausea, and ringing in her ears. *Id.* During these visits, Dr. Kind maintained his diagnosis of CFS. *Id.*

B. *The Final Decision of the Commissioner.* During the Hearing before the ALJ on March 14, 1995, the Plaintiff testified about the limitations that she has experienced as a result of her alleged CFS symptoms and, particularly, as they affected her ability to work and engage in activities of daily living. The Plaintiff's primary complaint, as it related to her asserted disability, was that she experienced regular and persistent fatigue, headaches, nausea, and other symptoms that were consistent with a diagnosis of CFS.

As a result of those symptoms, the Plaintiff testified that while she could she could do some light housework—including

---

**5.** Dysthymia is a mood disorder which is characterized by depressed feeling and loss of interest or pleasure in one's usual activities, and in which the associated symptoms have persisted for more than two years, but are not severe enough to meet the criteria for major depression. *Dorland's Illustrated Medical Dictionary*, p. 519 (28th Ed.1994).

dusting, cooking, washing clothes, and making the bed—she could not satisfy the demands of her previous employment as an early childhood special education teacher. [T. 51]. She noted that her husband vacuumed and washed the floors, because of her difficulty in performing those tasks, and that she shared the cooking and clothes washing with her husband. *Id.* The Plaintiff testified that, although she did some shopping, her husband did the majority of it, because she found the task so difficult. [T. 52].

It was her testimony that, despite the frequency and severity or her headaches and limited concentration, she read for one or two hours a day, *id.*, but she felt that she was able to follow the story lines of the books she read. *Id.* In addition to the books read by the Plaintiff, she also testified that she read a variety of magazines. *Id.* The Plaintiff described several occasions on which she took boat rides with her husband, but she noted that her participation was limited to sitting in the boat, and she did not assist in, for instance, the launching of the boat. [T. 544]. Beyond these pursuits, however, the Plaintiff disclaimed participating in any other hobbies or organizations. *Id.*

The Plaintiff recounted that she continued to drive a car, except that, on "bad days," she also avoided that activity. *Id.* Her testimony also included references to trips which she routinely took to visit her parents in Rochester, Minnesota (during the Summer), and to Las Vegas, Nevada (during the Winter). She also stated that it was her practice to travel to a mall, or to a department store twice a week in order to walk. [T. 56]. Her walks were limited, however, to a slow pace, and to a distance equivalent to two or three blocks. *Id.*

The ALJ noted that, while the Plaintiff reported that her symptoms had, by her account, remained constant since January of 1991, she nevertheless had continued to work as a full-time teacher until 1994, at which time she went on medical leave. [T. 64]. In response to the ALJ's comment, the Plaintiff stated that, despite the difficulties that continuing to work entailed, she was committed to her job, and to the children she taught, such that she did not wish to "give up." *Id.*

The Plaintiff also testified that she had traveled with her husband on a vacation to the Cayman Islands in February of 1995. *Id.* She recounted, however, that the extent of her activities, while on that vacation, was to rest on the beach. [T. 66]. She also stated that she drinks beer approximately once or twice a week, and that this occurs when "she makes [her] husband take [her] out usually on a Friday night." [T. 69].

Following the testimony of the Plaintiff, the ALJ called her husband, whom the ALJ had asked to remain outside the Hearing room during the Plaintiff's testimony, in order to testify concerning her disability claim. He testified that he did not consider his wife to be a "hypochondriac," as had been reported by one of the Plaintiff's attending physicians. [T. 74–75]. He also corroborated that the Plaintiff's time, which was spent in the Cayman Islands, was consumed with her resting either in her hotel room, or on the beach, but that it was "hard to get her to do anything at all." [T. 76]. The Plaintiff's husband also testified that there was a significant change in the ability of the Plaintiff to work after the onset of her ailment. [T. 77]. He related that, prior to 1991, the Plaintiff was very hard working, as compared to her current condition, which rendered her unable to work. *Id.*

The ALJ then called Joletta Harren, a Vocational Expert ("VE"), to testify. The VE stated that she had read the exhibits and had heard the testimony presented by the Plaintiff. [T. 77]. Before proceeding with the ALJ's questions, the VE asked the Plaintiff whether she had retained her teaching certification. [T. 78]. The Plaintiff responded that it was her understanding that she had. *Id.*

The ALJ formulated a hypothetical question for the VE, in which he asked the VE to assume a person with the Plaintiff's age and experience: (1) who was able to

perform light work; (2) who could work up to eight hours in a day; (3) who could not lift more than 20 pounds occasionally, and 10 pounds frequently; (4) who could be on her feet up to 6 hours in an 8 hour day, with normal breaks; (5) who would experience fatigue and other symptomology that would limit her level of concentration, consistent with reading novels, magazines, driving an automobile; and (6) who would be limited to work that would not be "in the highest level" of stressfulness. [T. 81]. The VE responded that the hypothetical individual could not perform the Plaintiff's past relevant work, but could perform other paraprofessional educational work in the regional economy, such as: (1) a child care worker, of which there were 3,710 positions in the region; and (2) a teacher's assistant, of which there were 1,250 jobs in the regional economy. [T. 81–82].

The ALJ then asked the VE to assume the same individual, except that this individual would be unable to function more than 2 to 3 hours in a day, because of a profound fatigue that would preclude sustained work beyond that amount of time. [T. 82]. The VE answered that there would be no available jobs for a person with those limitations in the regional economy. [T. 83].

As noted, on February 3, 1997, the ALJ issued a final decision which denied the Plaintiff's claim for benefits. He first determined that the Plaintiff was insured for disability benefits through the date of his decision. [T. 25]. Then, as he was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by 20 C.F.R. § 404.1520.[6] At Step Three, the ALJ held that, while severe, the Plaintiff's impairments, either singularly or in concert, were not among or equivalent to any of the Listed Impairments. [T. 30]; *20 C.F.R. Pt. 404, Subpt. P, App. 1.* At Step Four, the ALJ found that the Plaintiff retained the following residual functional capacity ("RFC"):

> the claimant has the residual functional capacity to perform the physical exertion requirements of light work with the following restrictions: she can be on her feet for no more than six hours in an eight hour work day; she requires normal breaks; she has a maximum concentration level that does not permit her to perform tasks requiring more concentration than tasks such as driving or reading novels and magazines; she requires a work environment which is not highly stressful; she cannot work in a[ ] position requiring intense interactions with other people; she cannot work in a work environment where a great deal of judgment is required.[7]

[T. 31].

At Step Five, the ALJ determined that the Plaintiff retained the RFC to perform a

---

**6.** The sequential evaluation procedures used to determine an entitlement to DIB and Supplemental Security income ("SSI") are identical. See, *20 C.F.R. §§ 404.1520 and 416.920; Russell v. Sullivan,* 950 F.2d 542, 543 n. 2 (8th Cir.1991). The five-step sequential process has been paraphrased as follows:

1. If the claimant is engaged in substantial gainful activity, disability benefits are denied.
2. If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether the impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.
3. If the impairment is severe, it is compared with the listed impairments the [Commissioner] acknowledges as precluding substantial gainful activity. If the im-

pairment is equivalent to one of the listed impairments, the claimant is disabled.
4. If there is no conclusive determination of severe impairment, then the [Commissioner] determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.
5. If the claimant cannot do her previous work, the [Commissioner] must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

*Trenary v. Bowen,* 898 F.2d 1361, 1363–64 n. 3 (8th Cir.1990), paraphrasing *Bowen v. Yuckert,* 482 U.S. 137, 140–42, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

**7.** Residual functional capacity is a measure of what a claimant can do despite his or her limitations. See, *20 C.F.R. § 416.945.*

significant number of jobs in the national economy—namely, those of a childcare worker, including a playroom attendant, a nursery school attendant, and a teacher's aide. [T. 30]; see also, *20 C.F.R. § 416.920(f)* ("[W]e will consider your residual functional capacity and your age, education, and past work experience to see if you can do other work" and, "[i]f you cannot, we will find you disabled."). As a consequence, the ALJ found that the Plaintiff was not disabled, within the meaning of the Social Security Act, at any time through the date of his decision. [T. 31]. The Plaintiff now challenges the ALJ's decision to deny her claim for benefits.

## IV. *Discussion*

A. *Standard of Review.* The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole. *Title 42 U.S.C. § 405(g)*; see, e.g., *Gallus v. Callahan*, 117 F.3d 1061, 1063 (8th Cir.1997); *Hall v. Chater*, 109 F.3d 1255, 1258 (8th Cir.1997); *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir.1996). This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision. *Morse v. Shalala*, 32 F.3d 1228, 1229 (8th Cir.1994), citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488–91, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Brock v. Secretary of Health and Human Services*, 791 F.2d 112, 114 (8th Cir.1986). Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, *Newton v. Chater*, 92 F.3d 688, 692 (8th Cir.1996); *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir.1996); *Morse v. Shalala*, supra at 1229, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed. See, *Jackson v. Hartford Accident and Indemnity Co.*, 422 F.2d 1272, 1277 (8th Cir.1970) (Lay, J., concurring), cert. denied, 400 U.S. 855, 91 S.Ct. 86, 27 L.Ed.2d 92 (1970). In review, a Court must take consideration the weight of the evidence, apply a balancing

test, and determine whether or not substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was granted or denied. See, *Loving v. Department of Health and Human Services*, 16 F.3d 967, 969 (8th Cir.1994); *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir.1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Black v. Apfel*, 143 F.3d 383, 385 (8th Cir.1998); *Ostronski v. Chater*, 94 F.3d 413, 416 (8th Cir.1996); *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir.1996); *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir.1996). Therefore, if it is possible to draw two inconsistent positions from the evidence and one of those positions coincides with the agency's findings, then we must affirm the decision. *Ostronski v. Chater*, supra at 416; *Mapes v. Chater*, supra at 262; *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir.1994). Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result. *Harris v. Shalala*, 45 F.3d 1190, 1193 (8th Cir.1995); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir.1993); *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir.1992).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions and, therefore, it embodies a "zone of choice" within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir.1994); *Nelson v. Sullivan*, 946 F.2d 1314, 1316 (8th Cir.1991); *Steele v. Sullivan*, 911 F.2d 115, 116 (8th Cir.1990). Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual Record *de novo*. *Roe v. Chater*, supra at 675; *Harris v. Shalala*, supra at 1193; *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir.1994), citing

*Loving v. Department of Health and Human Services,* supra at 969.

B. *Legal Analysis.* In support of her Motion for Summary Judgment, the Plaintiff advances the following arguments:

1. The ALJ failed to give proper consideration to the Plaintiff's own subjective claims of impairment which, she contends, are corroborated by substantial evidence on the Record as a whole.

2. The ALJ failed to give appropriate weight to the opinions of her treating physician, Dr. Kind, whose assessment of her condition, in the Plaintiff's view, supports a finding of disability.

3. The ALJ's hypothetical to the VE failed to fully incorporate all of the attributes of her alleged impairments, such that the VE could not adequately assess the jobs available to her in the regional economy.[8]

We address each of the Plaintiff's arguments in turn.

1. *The ALJ's Credibility Determination.*

██ a. *Standard of Review.* The governing law makes clear that credibility determinations are initially within the province of the ALJ. *Driggins v. Bowen,* 791 F.2d 121, 125 n. 2 (8th Cir.1986); *Underwood v. Bowen,* 807 F.2d 141, 143 (8th Cir.1986). As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole. See, *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993).

[2] To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the Plaintiff's testimony, must demon-

strate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony. See, *Shelton v. Chater,* 87 F.3d 992, 995 (8th Cir.1996); *Hall v. Chater,* 62 F.3d 220, 223 (8th Cir.1995); *Ricketts v. Secretary of Health and Human Services,* 902 F.2d 661 (8th Cir.1990). These requirements are not mere suggestions, but are mandates that impose affirmative duties upon the ALJ. *Johnson v. Secretary of Health and Human Services,* 872 F.2d 810, 814 n. 3 (8th Cir.1989).

██ The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in the Eighth Circuit by *Polaski v. Heckler,* 739 F.2d·1320 (8th Cir.1984) (subsequent history omitted), and its progeny. See, e.g., *Ostronski v. Chater,* supra at 418; *Shelton v. Chater,* supra; *Jones v. Chater,* 86 F.3d 823 (8th Cir.1996). Factors which the ALJ must consider, in the evaluation of the Plaintiff's subjective symptoms, include the Plaintiff's prior work record and the observations of third parties, and of physicians, concerning:

1. the claimant's daily activities;
2. the duration, frequency, and intensity of the pain;
3. precipitating and aggravating factors;
4. dosage, effectiveness and side effects of medication; and
5. functional restrictions.

*Polaski v. Heckler,* supra at 1321–22.

The ALJ must not only consider these factors, but he must list them and explain the resolution of any demonstrable conflict or inconsistency in the Record as a whole. Cf., *Jones v. Chater,* supra at 826; *Delrosa*

---

8. Although we identify each of the issues the Plaintiff has advanced in contesting the Commissioner's decision, in view of our rulings on the first two issues, that the Plaintiff has identified, no useful purpose would be served in addressing the propriety of the hypotheticals that the ALJ framed for the VE. Since the Plaintiff has principally pinioned her objec-

tion to those hypotheticals on the ALJ's determination of her RFC, which is critically influenced by the ALJ's credibility findings, and not upon some systemic defect in the hypotheticals themselves, we have no reason to believe that, on remand, the ALJ will not be able to frame acceptable hypotheticals on the Record then assembled.

*v. Sullivan,* 922 F.2d 480 (8th Cir.1991); *Carlock v. Sullivan,* 902 F.2d 1341 (8th Cir.1990).

 It is well-settled that an ALJ may not disregard a claimant's subjective complaints of pain or other subjective symptoms solely because there is no objective medical evidence to support them. *Ostronski v. Chater,* supra at 418; *Jones v. Chater,* supra; but cf., *Johnston v. Shalala,* supra at 451 (8th Cir.1995) (ALJ should consider absence of objective medical basis as a factor to discount the severity of a claimant's subjective complaints of pain). It is also firmly established that the physiological, functional, and psychological consequences of illness, and of injury, may vary from individual to individual. *Simonson v. Schweiker,* 699 F.2d 426 (8th Cir. 1983). For example, a "back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to \*\*\* general physical well-being is generally deteriorated." *O'Leary v. Schweiker,* 710 F.2d 1334, 1342 (8th Cir.1983); see also, *Landess v. Weinberger,* 490 F.2d 1187 (8th Cir.1974). Given this variability, an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a whole. *Taylor v. Chater,* 118 F.3d 1274, 1277 (8th Cir.1997); *Johnson v. Chater,* supra at 944.

 Nevertheless, as the decisions of this Circuit make clear, the interplay of the *Polaski* factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of debilitating symptoms, is multi-varied. For example, an individual's failure to seek aggressive medical care militates against a finding that her symptoms are disabling. *Chamberlain v. Shalala,* 47 F.3d 1489, 1494 (8th Cir.1995); *Barrett v. Shalala,* 38 F.3d 1019, 1023 (8th Cir.1994); *Rautio v. Bowen,* 862 F.2d 176, 179 (8th Cir.1988). By the same token, "[i]nconsistencies between subjective complaints of pain and daily liv-

ing patterns may also diminish credibility." *Pena v. Chater,* 76 F.3d 906, 908 (8th Cir.1996); see also, *Lawrence v. Chater,* 107 F.3d 674, 676–77 (8th Cir.1997) (ALJ may discredit complaints that are inconsistent with daily activities); *Clark v. Chater,* 75 F.3d 414, 417 (8th Cir.1996); *Shannon v. Chater,* 54 F.3d 484, 487 (8th Cir.1995). Among the daily activities, which counterindicate disabling pain, are: a practice of regularly cleaning one's house, *Spradling v. Chater,* 126 F.3d 1072, 1075 (8th Cir. 1997); *Chamberlain v. Shalala,* supra at 1494; cooking, *id.;* and grocery shopping, *Johnson v. Chater,* 87 F.3d 1015, 1018 (8th Cir.1996). Although daily activities, standing alone, do not disprove the existence of a disability, they are an important factor to consider in the evaluation of subjective complaints of pain. *Wilson v. Chater,* 76 F.3d 238, 241 (8th Cir.1996).

It is also settled law that, "when an ALJ fails to believe lay testimony about a claimant's allegations of pain, he should discuss the testimony specifically and make explicit credibility determinations." *Prince v. Bowen,* 894 F.2d 283, 286 (8th Cir.1990); *Smith v. Heckler,* 735 F.2d 312, 317 (8th Cir.1984) ("We have held that a failure to make credibility determinations concerning such evidence requires a reversal and remand."); but cf., *Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir.1992) ("While it is preferable that the ALJ delineate the specific credibility determinations for each witness, an 'arguable deficiency in opinion-writing technique' does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome."), citing *Benskin v. Bowen,* 830 F.2d 878, 883 (8th Cir.1987).

 b. *Legal Analysis.* The Plaintiff challenges the ALJ's determination that her subjective complaints of pain, to the extent that they were indicative of her inability to perform even sedentary work, were not credible. The importance of this conclusion, as applied to a case involving CFS, can hardly be overstated. The Social Security Administration's Program

Operations Manual System (1993) ("POMS"), has established a policy for the evaluation of claims premised on CFS, which states in pertinent part:

Chronic Fatigue Syndrome (CFS) \*\*\* is a systemic disorder consisting of a complex of variable signs and symptoms which may vary in duration and severity. The etiology and pathology of the disorder have not been established. Although there are no generally accepted criteria for the diagnosis of cases of CFS, an operational concept is used by the medical community. There is no specific treatment, and manifestations of the syndrome are treated symptomatically.

CFS is characterized by the presence of persistent unexplained fatigue and by the chronicity of other symptoms. The most prevalent symptoms include episodes of low-grade fever, myalgias, headache, painful lymph nodes, and problems with memory and concentration. These symptoms fluctuate in frequency and severity and may be seen to continue over a period of many months. Physical examination may be within normal limits. Individual cases must be adjudicated on the basis of the totality of evidence, including the clinical course from the onset of the illness, symptoms, signs, and laboratory findings. Consideration should be given to onset, duration, severity and residual functional capacity following the sequential evaluation process.

*POMS § 24575.005 (1993);* see also, *Rose v. Shalala,* 34 F.3d 13, 16 (1st Cir.1994). Since CFS is commonly diagnosed on a symptomatic basis, rather than by the application of objective medical testing, the subjective representations of a claimant take on special significance, as do the corresponding credibility assessments of the ALJ. See, *Fragale v. Chater,* 916 F.Supp. 249, 253 (W.D.N.Y.1996), citing *Reed v. Secretary of Health & Human Services,* 804 F.Supp. 914, 918 (E.D.Mich.1992).

The appraisal of the debilitating impact of CFS has proved as nettlesome to the medical community, as it has to the Courts which have been called upon to review a claimant's entitlement to benefits for a CFS-generated disability. See, e.g., *Reddick v. Chater,* 157 F.3d 715 (9th Cir. 1998) (reversing District Court's affirmance of the Commissioner's denial of benefits to claimant suffering from CFS); *Adams v. Chater,* 93 F.3d 712 (10th Cir. 1996) (same); *Rose v. Shalala,* 34 F.3d 13 (1st Cir.1994) (same); *Sisco v. United States Department of Health and Human Services,* 10 F.3d 739 (10th Cir.1993); *Cohen v. Secretary of Department of Health and Human Services,* 964 F.2d 524 (6th Cir.1992); *Aidinovski v. Apfel,* 27 F.Supp.2d 1097 (N.D.Ill.1998) (reversing Commissioner's denial of benefits to a claimant suffering from CFS); *Olson v. Apfel,* 17 F.Supp.2d 783 (N.D.Ill.1998) (same); *Hilton v. Apfel,* 1998 WL 241616 (S.D.N.Y.1998) (same); *Davis v. Callahan,* 985 F.Supp. 907 (S.D.Iowa 1997) (same). Almost invariably, the crux of the Court's decision balances on the ALJ's credibility assessments, and on the tension between those assessments—which, in these decisions, have tended to discredit the claimant's assertion of an inability to be gainfully employed—and the opinion of a treating physician who, with some regularity, has concluded that the claimant was functionally disabled. The very same friction arises here.

In his decision, the ALJ determined that, based upon the entirety of the Record, the Plaintiff's subjective complaints of impairment were not fully credible. To support this finding, he noted that, while the Plaintiff alleged only minimal daily activities, she actually performed a number of household duties, and maintained social contacts, which were inconsistent with a person who was too impaired to work. [T. 28]. Supportive of this finding was the evidence of Record that the Plaintiff was able to perform a number of daily activities which, in the ALJ's view, contraindicated a disability. First, the Plaintiff was able to perform a variety of household chores, which included driving an automo-

bile, dusting, cooking, cleaning, making the bed, light shopping, and the washing clothes. The ALJ determined that the Plaintiff's subjective complaints of impairment were not fully consistent with this level of physical activity.

In contrast, the Plaintiff contends that the ALJ did not fully appreciate the extent of her physical limitations, because he failed to account for the fact that the noted household chores were shared with, or were assisted by, her husband. She notes that even a person who is able to do light housekeeping, or other simple tasks, may be vocationally disabled. Of particular importance, the Plaintiff underscores her testimony as to her level of dysfunctionality on both "normal" and "bad" days. The Plaintiff testified as follows:

Q. You told the Judge about the various symptoms that you have, do you have all those symptoms every day, or do those symptoms come and go in varying frequency?

A. I have some of the symptoms all of the time, such as the ringing in the ears, and the nausea is pretty much every morning, some of the other symptoms come and go, depending on how much I've done.

Q. Okay, so you get up every morning you feel this nausea?

A. Yes.

Q. And, how long does it last?

A. Till about 10, 11 o'clock in the morning, it subsides enough that I can brush my teeth. If I'm having a bad day, I may have it all day. If I'm having a bad day, I don't get out of my pajamas, I don't, sometime don't even get out of bed.

Q. Do you have those kind of days, those bad days like you just described very frequently?

A. I would say, four times a week.

Q. So,—

A. Three to four.

Q. —so as of ten as three or four times a week, you wouldn't get out of your pajamas?

A. No, Correct.

Q. Okay. On those days, where you don't feel good all day, are those the days that you other symptoms are there too?

A. Yes.

Q. Like which ones?

A. Like the aching, the sleeplessness, the short term memory is really a problem when I'm having a bad day, the total fatigue, the dizziness.

[T. 70–71].

The decision of the ALJ does not expressly address this testimony and, frankly, the Record was not meaningfully developed by either the ALJ, or counsel for the Plaintiff, as to the scope, intensity, or duration, of the Plaintiff's household chores. By way of but one example, on this Record, we do not know whether the dusting was confined to a particular area of the Plaintiff's residence, or was performed over the course of hours. Quite clearly, if the Plaintiff's testimony is credited, her prospect of enduring substantial gainful activity would be dim, particularly on her "bad" days.

We are mindful that the ALJ was persuaded that the Plaintiff's perseverance in working for a year, or two, before she concluded that she could not continue in special education, could question her motivation to work, particularly when she testified that her overall condition was essentially unchanged from the date she was first diagnosed with CFS, and her last day of work. We think it questionable, however, to penalize a claimant with a general discrediting of her testimony because she attempted to endure a malady which ultimately resulted in her decision to terminate work which she regarded as being important to her. We do not say that the ALJ erred in such a discrediting, for our function is not to draw findings of our own, but we do find unsettling the apparent failure of the ALJ to view the evidence in its entirety, as instructed by the POMS.

Similarly, we find nothing which should particularly challenge the Plaintiff's believ-

ability merely because she chose to take a vacation with her husband, or to visit her parents in Las Vegas. Here, the Plaintiff, and her husband, testified that the effect of the vacation was, essentially, to transfer her recumbency to a climate more alluring than a Winter in Minnesota, and the Record does not so much as suggest that, when in the company of her parents, the Plaintiff no longer suffers the effects of CFS, which were repeatedly reported by her treating physicians.

Nor do we overlook the ALJ's apparent reliance upon the findings of Dr. Sandvick, a licensed psychologist, who, on October 30, 1996, personally interviewed, and tested the Plaintiff, during the course of a psychological examination. [T. 252–57]. Dr. Sandvick concluded that the Plaintiff suffered from a pathologically dependent personality. *Id.* Included in Dr. Sandvick's assessment of the Plaintiff was his conclusion that "[t]he [Plaintiff] may attempt to control others by complaining of physical symptoms," and that "[h]er physical complaints are likely to be used to gain attention to her perceived illnesses." [T. 256]. Unfortunately, the ALJ did not inquire of any medical advisor, treating physician, or consultative professional, as to the potential for the Plaintiff's perceived somatic tendencies to be interrelated with her CFS. As the Court explained in *Sisco v. United States Department of Health and Human Services,* supra at 744 n. 1:

A review of the medical literature in the record demonstrates that a psychological overlay is consistent with a diagnosis of chronic fatigue syndrome; it often develops as a secondary reaction to the physical aspects of the disease. *** Furthermore, an overlay is simply an overlay. It does not change the nature of the underlying diagnosis.

Here, we simply cannot say, on the basis of Dr. Sandvick's examination, that his findings are anything other than a corroboration of Dr. Kind's clinical diagnosis.[9]

In sum, we are left with the unsettling prospect that, based upon a less than fully developed Record, the ALJ discounted the Plaintiff's subjective complaints on a less than competent basis. We conclude that the elusive etiology of CFS requires the development of a Record that allows a thorough assessment of the Plaintiff's physical and mental capabilities. Here, the Record allows little more than a facial appreciation of the level of effort that is required by the Plaintiff's daily activities, and the other common requisites of a disciplined credibility analysis are unacceptably underdeveloped. We are unable to conclude, on this Record, that the ALJ had a competent basis to discount the Plaintiff's subjective complaints, and yet we are unconvinced that the Plaintiff should be awarded DIB on a Record as undeveloped as this one. A remand, therefore, seems most appropriate. Although our analysis could properly end here, we believe it appropriate address the Plaintiff's objection to the ALJ's treatment of Dr. Kind's clinical conclusions, so as to guide a reconsideration upon remand.

2. *The Weight Given to the Opinions of the Plaintiff's Physicians.*

 a. *Standard of Review.* When related to medical findings, the opinion of a treating physician must be afforded substantial weight. See, e.g., *Miller v. Shalala,* 8 F.3d 611, 613 (8th Cir.1993); *Onstead v. Sullivan,* 962 F.2d 803, 805 (8th Cir. 1992); *Kirby v. Sullivan,* 923 F.2d 1323, 1328 (8th Cir.1991); *Wilson v. Sullivan,* 886 F.2d 172, 177 (8th Cir.1989), *Turpin v. Bowen,* 813 F.2d 165, 170 (8th Cir.1987). Nevertheless, an opinion rendered by a claimant's treating physician is not necessarily conclusive. An ALJ may discount a

---

**9.** We presume that the ALJ scheduled the Plaintiff's examination by Dr. Sandvick as an effort of eliminating other potential explanations for her symptoms, including a psychological genesis. However, in the absence of medical expertise which would confirm that Dr. Sandvick's findings were an independent source of the Plaintiff's complaints, and not an integral component of her diagnosed CFS, we are left with a most tenuous basis upon which to disqualify a claim for DIB.

treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating physician's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole. See, *Ghant v. Bowen*, 930 F.2d 633, 639 (8th Cir.1991); *Kirby v. Sullivan*, supra; *Ward v. Heckler*, 786 F.2d 844, 846 (8th Cir. 1986).

█ The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence. *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir.1997); *Ward v. Heckler*, supra at 846. In short, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise. *Id.* As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement. *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir.1996), citing *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir.1991). Rather, conclusory opinions, which are rendered by a treating physician, are not entitled to greater weight than any other physician's opinion. *Id.; Metz v. Shalala*, 49 F.3d 374, 377 (8th Cir.1995).

The Code of Federal Regulations sets forth additional factors, to assist the ALJ in determining what weight should be afforded to the opinion of a given physician, including a treating physician. The Regulations encourage the ALJ to afford more weight to those opinions which are "more consistent with the record as a whole." *20 C.F.R. § 416.927(d)(4)*. More weight is also to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *20 C.F.R. § 416.927(d)(5)*. When presented with a treating physician's opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that

as proportionate to the knowledge that the medical provider has about the claimant's impairments. *20 C.F.R. § 416.927(d)(2)(ii)*. Finally, the Regulations make clear that the opinions of treating physicians, on questions reserved for the Commissioner—such as whether a claimant is disabled, or is unable to work—are not to be given any weight by the ALJ. *20 C.F.R. § 416.927(e)(1)*.

b. *Legal Analysis.* In his decision, the ALJ found that the Plaintiff suffered from CFS, and that her impairments, which were attributable to CFS, were severe. [T. 26]. Notwithstanding those findings, the ALJ determined that the Plaintiff retained an RFC which allowed her to perform jobs which were available in the regional economy.

It is the Plaintiff's position that, in determining her RFC, the ALJ failed to accord proper weight to the conclusion of her treating physician, Dr. Kind, as to his assessment of her medical condition, as well as to his opinion that she was unable to perform even sedentary work. To support this contention, she points to the inherently subjective nature of the process of diagnosing CFS. The Plaintiff properly notes that a diagnosis of CFS "is marked almost entirely by subjective symptoms rather than objective, easily determinable components." *Pl. Memorandum in Response*, at 2. She concedes that Dr. Kind relied heavily, of necessity, upon her subjective complaints in reaching his diagnosis. Indeed, what the Plaintiff primarily challenges is the ALJ's rejection of Dr. Kind's opinion that she could not perform even sedentary work, despite the ALJ's acceptance of Dr. Kind's diagnosis of CFS.

Of course, in refusing to accept Dr. Kind's "disability" conclusion, the ALJ expressly discounted certain of the Plaintiff's subjective complaints, as being inconsistent with the Record as a whole, which Dr. Kind appears to have accepted at face value. According to the Plaintiff, the disparate treatment of her treating physician's diagnosis—on the one hand—and his

conclusions regarding the totally incapacitating sequelae of CFS, as experienced by the Plaintiff, is both internally inconsistent, and unsupported by the Record. As a consequence, the Plaintiff argues that the ALJ erred by refusing to afford the opinions of Dr. Kind the substantial weight they generically deserved. See, *Burress v. Apfel*, 141 F.3d 875, 880 (8th Cir.1998).

Given our rejection of the bases upon which the ALJ rendered his credibility findings, as structurally flawed, we need not reach the issue of whether the ALJ could properly reject Dr. Kind's assessment of the Plaintiff's capacity to engage in substantial gainful activity. Stated simply, the ALJ accepted the clinical legitimacy of Dr. Kind's *medical* opinions, but rejected his disability determination as having been premised upon the subjective complaints of the Plaintiff that the ALJ found unavailing. Since we find that the ALJ's credibility findings are not supported by substantial evidence, the Record having been insufficiently developed to allow competent findings, we have no reason to further assess the propriety of the ALJ's rejection of Dr. Kind's disability rating.

We wish to make clear, however, that we find nothing intrinsically discordant in an ALJ's rejection of a clinical diagnosis which is premised upon the clinician's acceptance of subjective complaints that the ALJ has properly determined to be beyond belief. As our Court of Appeals reiterated, in *Rogers v. Chater*, supra at 602:

> This Court's cases require the SSA to give treating physicians' opinions great weight, but "such an opinion is not conclusive in determining disability status, and the opinion must be supported by medically acceptable clinical or diagnostic data." Pena v. Chater, 76 F.3d 906, 908 (8th Cir.1996). The opinion of a treating physician can be discounted if other assessments are supported by better or more thorough medical evidence. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir.1986).

Here, the ALJ appears to discount Dr. Kind's clinical assessment by observing as follows:

> As discussed above, Dr. Sandvick also indicates that the claimant has a pathologically dependent personality. There is no indication in the medical record that the claimant's treating physician is aware of these aspects of the claimant's personality and how these **may** be a factor in the way she presents herself to her physician. Dr. Kind's reports indicate that he takes the claimant's complaints at face value; "It would seem to me from what she told me that she is disabled \*\*\*." \*\*\* Thus, the undersigned is inclined to place greater weight on Dr. Sandvick's assessment of the claimant's ability to work than on the assessment by Dr. Kind that she is unable to work at even a sedentary level.

[T. 29; emphasis supplied].

But for a crucial shortcoming, we would be prepared to accept the ALJ's preference for one medical opinion over another, so long as that selection was otherwise supported by substantial evidence on the Record as a whole. As we have already noted, Dr. Sandvick's assessment was not a differential diagnosis, for he did not attempt, in any way, to attribute the Plaintiff's medical condition to his psychological findings—that is, to the exclusion of the Plaintiff's CFS. Indeed, the ALJ accepts the role of the Plaintiff's psychological testing, in its capacity to be a determinant of the Plaintiff's capacity to forthrightly present herself to her treating physician, as being no more than a "may"-type of hypothesis. In fact, notwithstanding his significant exposure to the Plaintiff, Dr. Kind regarded her as a "straight shooter," [T. 151], and as not demonstrating "primary depression." [T. 251]. Nor can we overlook the notable fact that Dr. Kind was sufficiently convinced of the Plaintiff's febrile physical state as to recommend her removal from her employment—employment that she personally found fulfilling—for significant periods of time.

In sum, we part company with the ALJ's analysis at the point where the ALJ implicitly treats CFS as a simple diagnostic phenomenon whose cause can be identified with some ease. As have Courts before us, we find that "[t]he ALJ's failure to acknowledge the POMS guidelines may be emblematic of the reluctance to acknowledge CFS that appears to underlie his decision." *Reddick v. Chater*, supra at 728. Here, the ALJ accepted the diagnosis of CFS by both Dr. Kind, and by Dr. Sandvick, [T. 26], and yet the ALJ does not appear to employ a "totality of evidence" approach—preferring, instead, to tag the Plaintiff's chronic fatigue to some perceived need for dependency. The cause and effect of the Plaintiff's fatigability is not resolvable on any simplistic plane. As the Court explained, in *Rose v. Shalala*, supra at 19, "[t]he subjective severity of a claimant's fatigue associated with CFS is not something readily evaluated on an algid administrative record." Under the facts of this Record, on remand we commend the employment of a Medical Advisor who can integrate the clinical findings of the various medical providers, with the Plaintiff's subjective complaints. In the words of the Court, in *Sisco v. United States Department of Health and Human Services*, supra at 744:

> The "operational" diagnosis technique used by the medical community at the present time involves testing, the matching of a detailed list of symptoms, the painstaking exclusion of other possible disorders, and a thorough review of the patient's medical history.

Given the circumstances presented to the ALJ in this case, we conclude that the employment of a Medical Advisor would appear to have been indispensable.

Lastly, we recommend a remand, as opposed to an outright reversal, because we are not persuaded that the Record, as undeveloped as it now appears, overwhelmingly supports a disability, and the award of DIB. See, *Trossauer v. Chater*, 121 F.3d 341, 343 (8th Cir.1997), citing *Fowler v. Bowen*, 866 F.2d 249, 253 (8th Cir.1989).

NOW, THEREFORE, It is—

RECOMMENDED:

1. That the Plaintiff's Motion for Summary Judgment [Docket No. 5] be denied.

2. That the Defendant's Motion for Summary Judgment [Docket No. 10] be denied.

3. That the matter be remanded to the Commissioner for further proceedings in accordance with the views expressed in this Report.

4. That, pursuant to the holding in *Shalala v. Schaefer*, 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993), Judgment be entered accordingly.

January 13, 1999.